Filed 5/2/16 (with dissent)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| J-M MANUFACTURING COMPANY, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PHILLIPS & COHEN LLP, <br><br> Defendant and Appellant. | B256927 <br><br> (Los Angeles County <br> Super. Ct. No. BC537083) |

APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth Allen White, Judge. Reversed and remanded.

Kendall Brill & Klieger, Richard B. Kendall, Laura W. Brill, and Nicholas F. Daum for Defendant and Appellant.

Glassman, Browning, Saltsman & Jacobs, Anthony Michael Glassman, and Rebecca Nell Kaufman for Plaintiff and Respondent.

_____

The law firm of Phillips & Cohen LLP, issued a celebratory press release following the verdict in false claims act litigation in which the jury found J-M Manufacturing Company, Inc. (J-M) had knowingly misrepresented to Phillips & Cohen's governmental clients over a 10-year period that its polyvinyl chloride (PVC) pipe had been manufactured and tested in a manner that assured it had the strength and durability required by applicable industry standards. J-M responded by suing Phillips & Cohen for defamation and trade libel. The trial court denied Phillips & Cohen's special motion to strike the complaint under Code of Civil Procedure section 425.16 (section 425.16), finding it was a question of fact for the jury whether the press release was privileged as a fair and true report of a judicial proceeding within the meaning of Civil Code section 47, subdivision (d). We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The False Claims Act Litigation*

J-M manufactures and sells PVC pipes used in underground water systems. In 2006 Phillips & Cohen filed a federal qui tam lawsuit on behalf of a number of states, cities and local water districts asserting J-M had violated applicable false claims acts by knowingly misrepresenting that two types of pipes (C900 and C905) purchased by the plaintiffs had been manufactured in compliance with industry standards established by the American Water Works Association (AWWA) and the Underwriters Laboratories (UL) for long-term strength and durability.[1]

---

[1]     The AWWA requires pipes be made of a material that has an hydrostatic design basis (HDB) of 4000 pounds per square inch (psi). The HDB of a pipe is an important factor in determining its pressure rating and thus is a key indicator of its durability. The expected life span of a pipe with an HDB of 4000 psi, operating under normal conditions, is 50 to 100 years.

The UL's standard (UL 1285) requires a minimum longitudinal tensile strength of 7000 psi for the two types of pipe at issue here (C900 and C905). To test whether a pipe satisfies this standard, a specimen is cut from the pipe wall in line with the longitudinal direction of the pipe and pulled to measure how much force it takes to break that specimen.

To certify its pipes met the AWWA and UL standards, J-M had submitted qualification samples for testing. Based on those tests, J-M's production pipes were eligible to bear the corresponding AWWA and UL marks. However, AWWA and UL require the product to be "continually manufactured in such a manner as to maintain [its] long-term strength and durability" in conformity with the AWWA and UL standards. In other words, a product that bears the AWWA and UL marks must be substantially identical to the previously approved qualification samples. This requirement obligates a manufacturer to maintain uniformity in the manufacturing process so that every production pipe satisfies the standard. Any material variation in the process that produces a downward departure from the established standard is prohibited.

Trial of the qui tam action was to proceed in two phases. The first phase, which started in September 2013, concerned only issues of liability as presented by five representative governmental entity plaintiffs. Causation and damages were deferred to the second phase (if necessary). In its bifurcation order the district court described Phillips & Cohen's theory of the case: "Plaintiffs allege that J-M falsely represented that (a) *all* (not just some) J-M pipe satisfied the requirements, rules, and standards of [AWWA and UL] . . . ; and (b) *all* (not just some) of the pipe was manufactured in a substantially identical manner to the pipe that was originally determined to comply with the standards. Plaintiffs allege that J-M's statements were false because J-M did not properly manufacture 'all' its pipe as represented in (a) and (b) above. Plaintiffs further allege that J-M's statements were false because J-M did not uniformly test its pipe as represented in (a) and (b) above. Plaintiffs allege that instead, J-M manufactured or tested its pipe in a manner that did not comply with the foregoing industry standards. Plaintiffs allege that, as a result of J-M's inconsistent and substandard manufacturing and testing, J-M's customers received a 'lottery ticket,' in which there was no assurance that the pipe was made and tested in the manner represented." The court's order explained the first jury would decide whether J-M's manufacturing and testing deficiencies deviated from its representations to such a degree as to render J-M's representations false and

3

whether, if false, the representations were material and made with the requisite scienter. If the plaintiffs prevailed in the first trial, there would be a second trial to determine, among other things, the damages each governmental entity had suffered as a result of J-M's false claims.

Consistent with its theory of the case, Phillips & Cohen introduced substantial evidence that J-M manufactured pipes that did not uniformly conform to the AWWA and UL standards. In addition, it introduced evidence that the nonconformance was caused, at least in part, by J-M's decisions to alter its manufacturing process to meet increased production goals and by paying employee bonuses to achieve these goals. Though the quality of the pipes decreased because of these decisions, J-M nonetheless sold them as if they had met the AWWA and UL specifications.

Throughout trial Phillips & Cohen emphasized this was not a products liability case and that it did not need to demonstrate that J-M pipes sold to plaintiffs had already failed or to trace specific product defects to specific units of pipe that each plaintiff received. For example, in closing argument counsel stated, ". . . J-M falsely represented its compliance with AWWA C905, you know, general compliance. There's nothing that requires you to figure out if a particular stick of pipe that's in the ground was falsely marked or not falsely marked. Although, frankly, given the kinds of evidence that you've heard, none of their pipe was representative of what they originally qualified and none of it was able to pass UL 1285. So, really, all of the pipe was bad. But it certainly was falsely represented that all our pipe complies with AWWA C900. No question that [the] representation that all our pipe is made in uniform—in a uniform way, that was a representation they were making to their customers and it was clearly not true."

On November 14, 2013 the jury returned a special verdict in favor of each of the five representative plaintiffs, finding that J-M did "present or caused to be presented to a [government] officer or employee a claim for payment or approval that was false or fraudulent," that the claim was materially false and that J-M presented the false claim with the requisite intent. The special verdict form also asked the jury to describe why the

4

claims were false.  The jury responded with the same answer for every false claim:  "J-M falsely represented uniform compliance with AWWA [C900 and] C905 and UL 1285."  The jury also found for each of the 26 identified projects that J-M had acted knowingly and that the misrepresentation of compliance with the industry standards was material.

2. *The Press Release*

On November 15, 2013, the day after the jury's verdict, Phillips & Cohen issued a three-and-one-half page, single-spaced press release headlined, "JM Eagle faces billions in damages after jury finds JM liable for making and selling faulty water system pipes."  The press release stated in its first paragraph that "[a] federal jury unanimously agreed last night that [J-M] . . . knowingly manufactured and sold to government entities substandard plastic pipe that was used in water and sewer systems in various states around the country—opening [J-M] up to potentially billions of dollars in damages."  The release referred to the case as a "whistleblower lawsuit" and explained it had been divided into two phases:  "The first trial determined whether from 1996 to 2006 [J-M] lied about whether its pipe met strength and durability standards required by government specifications, thereby making it liable for damages under state and local false claims laws."  "A separate trial will be held to determine the amount of damages" for the costs to replace failed pipes and to replace pipes sooner than expected.

3. *J-M's Lawsuit for Defamation and Trade Libel*

On February 21, 2014 J-M filed a complaint for defamation and trade libel alleging statements in Phillip & Cohen's press release that "a federal jury unanimously found that J-M manufactured and sold pipe that is 'faulty,' 'substandard,' 'weak,' and 'shoddy'" were "neither a fair nor an accurate report of the proceedings" and grossly misrepresented the jury's findings.  As alleged in the complaint, the issue decided by the federal jury was whether J-M had falsely represented uniform compliance with industry standards.  Whether its pipe was substandard or defective was not at issue in phase one of the federal litigation, and the federal plaintiffs had never proved the pipe sold was substandard or defective.

5

In addition to the headline of the press release, J-M specifically challenged three statements appearing on the first page of the document: (1) The last sentence of the second paragraph, "The trial exposed JM Eagle's deliberate efforts to cut costs by using shoddy manufacturing practices to make weaker but more profitable polyvinyl chloride (PVC) pipe." (2) The third full paragraph, "'States and water districts that are covered by this lawsuit spent $2.2 billion to buy JM Eagle during the 10-year period JM was lying about the long-term strength of the pipe,' said Eric Havian, an attorney with Phillips & Cohen LLP who argued the case on behalf of the plaintiffs. 'Those entities now are entitled to recover a substantial portion of that cost plus the cost to replace the shoddy pipe much sooner than expected. This likely will mean damages could total billions of dollars because it's expensive and disruptive to replace water pipe.'" (3) The fifth full paragraph: "'JM Eagle defrauded its customers for 10 years,' Havian continued. 'The jury decided that JM Eagle management cared only about the amount of pipe JM produced, not the quality of that pipe. JM Eagle deceived outside inspection agencies and ignored over a decade of failing test results. The jury's conclusion that JM Eagle committed fraud was based on a lot of evidence.'"

4. *The Special Motion To Strike*

On March 26, 2014 Phillips & Cohen moved to strike the complaint under section 425.16, contending both causes of action were "based upon public statements made describing an ongoing litigation of national importance" and arguing J-M could not show a probability of prevailing on the merits because "[t]he allegedly defamatory and libelous statements at issue are privileged as a true and fair report of ongoing litigation" under Civil Code section 47, subdivision (d), and the statements "are non-actionable statements of opinion." In opposition J-M conceded Phillips & Cohen had made the threshold showing required by section 425.16 that the two causes of action arose from protected activity but argued it had demonstrated a probability of prevailing because the portions of the press release it challenged were "a gross misrepresentation of the jury's

findings" and not privileged as a fair and true report or as nonactionable statements of opinion.

The trial court denied the motion, ruling, "The statement that a jury found [J-M] liable for making and selling faulty water pipes cannot be said—as a matter of law—to be a fair and true report of the jury's special verdict. The jury found that [J-M] violated the False Claims Act, which is not the same thing as finding that [J-M] made and sold faulty water pipes. At the very least, whether the report was fair and true is a question of fact for the jury." The court also found that "[a] reasonable fact finder could conclude that this published statement declares or implies a provably false assertion of fact because an examination of the jury instructions and special verdict [shows] the jury did not expressly find that [J-M] was liable for making and selling faulty water system pipes. Rather, the jury found that [J-M] made false representations of uniform compliance. The jury was not asked to find, and did not find, that [J-M's] water system pipes were faulty." This, "by implication, leaves open the possibility of non-compliance as to some pipes," but "the jury did not find that the pipes were all faulty." A reasonable fact finder "could find that the substance, gist, or sting of [P&C's] characterization of the jury's finding that the pipes were faulty was not justified." Thus, J-M demonstrated a probability of prevailing on its claims.

## DISCUSSION

### 1. *Section 425.16: The Anti-SLAPP Statute*[2]

Section 425.16 provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff

---

[2]     SLAPP is an acronym for "strategic lawsuit against public participation." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 815, fn. 1.)

has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)[3]

In ruling on a motion under section 425.16, the trial court engages in a familiar two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

In terms of the so-called threshold issue, the moving party's burden is to show "the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was

---

[3]  Under the statute an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

*based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]  'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e) . . . .'"  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

If the defendant establishes the statute applies, the burden shifts to the plaintiff to demonstrate a "probability" of prevailing on the claim.  (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.)  In deciding the question of potential merit, the trial court properly considers the pleadings and evidentiary submissions of both the plaintiff and the defendant, but may not weigh the credibility or comparative strength of any competing evidence.  (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 19-20.)  The question is whether the plaintiff presented evidence in opposition to the defendant's motion that, if believed by the trier of fact, is sufficient to support a judgment in the plaintiff's favor.  (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.)  Nonetheless, the court should grant the motion "'if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'"  (*Vargas,* at p. 20; *Zamos,* at p. 965.)

The defendant has the burden on the first issue; the plaintiff has the burden on the second issue.  (*Chodos v. Cole* (2012) 210 Cal.App.4th 692, 701; *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928.)  We review the trial court's rulings independently under a de novo standard of review.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325; *Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1055.)

2.  *The Trial Court Erred in Denying the Special Motion To Strike*

a.  *Defamation, trade libel and the fair report privilege*

"Defamation requires the intentional publication of a false statement of fact that has a natural tendency to injure the plaintiff's reputation or that causes special damage."  (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 383.)  The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a

9

natural tendency to injure or causes special damage.  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.)

Trade libel is an intentional disparagement of the quality of services or product of a business that results in pecuniary damage to plaintiff.  (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 375-376; *Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 572.)  Like defamation, trade libel requires a false statement of fact, not an expression of an opinion.  (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 104; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010.)  To constitute trade libel the statement must be made with actual malice, that is, with knowledge it was false or with reckless disregard for whether it was true or false.  (*Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1350.)  The plaintiff must also plead and prove it actually suffered some pecuniary loss.  (*Mann,* at p. 109.)

Civil Code section 47, subdivision (d), provides, "A privileged publication or broadcast is one made:  [¶] . . . [¶]  (d)(1)  By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof . . . ."  Prior to 1997 subdivision (d) applied only to a fair and true report *in* a public journal.  Senate Bill No. 1540 (1995-1996 Reg. Sess.), sponsored by the California Newspapers Publishers Association, amended the provision, effective January 1, 1997, to add "or communication to," so the privilege would extend, as it does now, to both a fair and true report in and a communication to a public journal concerning judicial, legislative or other public proceedings.  (Stats. 1996, ch. 1055, § 2, pp. 6641-6643.)

The Assembly Committee on the Judiciary's report explained the 1996 amendment, "This bill codifies a type of 'bridge privilege' between the litigation privilege and the fair report privilege.  It protects fair and true reports to the press of things that occurred or were said in an official proceeding.  These statements are protected when originally uttered by the litigation privilege and are protected when published by the press by the fair report privilege.  This bill creates the bridge between

10

these two privileges to protect a third party who communicates this already privileged material to the press." (Assem. Comm. on Judiciary, Rep. on Sen. Bill No. 1540 (1995-1996 Reg. Sess.) as amended June 26, 1996, p. 5.) In its statement of legislative purpose the Legislature declared its intent "to preserve the scarce resources of California's courts, to avoid using courts for satellite litigation, and to increase public participation in the political, legislative, and judicial processes." (Stats. 1996, ch. 1055, § 1, p. 6641.)

This "fair report" privilege, if applicable, bars J-M's claims for both defamation and trade libel. (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1055; see *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 278 ["[i]f Civil Code section 47, subdivision (d) applies, the statement is absolutely privileged regardless of the defendants' motive for reporting it"]; *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 240 [Civ. Code, § 47, subd. (d), "confers an absolute privilege"].)[4]

b. *Application of the fair report privilege*

In general, whether a privileged occasion exists within the meaning of Civil Code section 47, subdivision (d), is for the court to decide; whether the report of the official proceedings itself is "fair and true," provided reasonable minds could disagree as to the effect of the communication on the average reader or listener, is a question of fact for the jury. (*Burrill v. Nair, supra*, 217 Cal.App.4th at p. 398; *Pierce v. San Jose Mercury News* (1989) 214 Cal.App.3d 1626, 1634; *Handelsman v. San Francisco Chronicle*

---

[4] Because the privilege is absolute, Phillip & Cohen's motivation for drafting the press release in the manner it did—that is, whether it "selective[ly] use[d] . . . language designed to skirt around the edges of the law of defamation," as our dissenting colleague speculates—has no bearing on the question whether the few portions of the release challenged as false by J-M, when read in context, are substantially accurate and thus a fair and true report of the qui tam proceedings. (See, e.g., *Howard v. Oakland Tribune* (1988) 199 Cal.App.3d 1124, 1128 ["[t]he privilege accorded by section 47, subdivision (4) [now subdivision (d)] has been absolute since 1945 when the Legislature deleted the qualifying requirement that such privileged publications be made without malice"]; *Jennings v. Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119, 128 [court has no reason to consider evidence of malice in determining whether fair report privilege applies].)

11

(1970) 11 Cal.App.3d 381, 386; but see *McClatchy Newspapers v. Superior Court* (1987) 189 Cal.App.3d 961, 976 [reversing denial of summary judgment; although trial court found fairness and truth of newspaper's report was a controverted issue, "case law indicates this decision is one of law when, as here, there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the report"].)

Although determining whether a communication is privileged under Civil Code section 47, subdivision (d), may properly be left to a jury in some instances, appellate courts have not been reluctant to decide the fair report privilege applies as a matter of law when the undisputed facts are insufficient to support a judgment for the plaintiff. For example, in *Kilgore v. Younger* (1982) 30 Cal.3d 770 plaintiff Kilgore sued former Attorney General Younger and two newspapers following distribution of a report prepared by the Attorney General's Organized Crime Control Commission that listed 92 individuals suspected of involvement in a wide variety of organized crime activity in California, including bookmaking, loan sharking, extortion, theft, drug trafficking, prostitution and murder. The report identified Kilgore by name and address, included his photograph, specifically identified his involvement in providing information on sporting events to bookmakers and stated he had been convicted of bookmaking in the past and had been sentenced to a 14-month federal prison term for conspiracy to commit wire fraud. The two newspapers reported Kilgore was one of the 92 individuals named in the report but, unlike the report itself, did not describe his participation in gambling activity or link him to any other specific organized criminal activity. Kilgore sued for defamation, contending the newspaper articles unfairly suggested he was involved in a wide variety of the criminal activity discussed in the report, rather than only bookmaking. The Supreme Court affirmed the trial court's order sustaining the newspapers' demurrers as a fair and true report of a public meeting and dismissing Kilgore's action as to them: "In our view, the average reader of either paper would reasonably interpret the articles to imply only that Kilgore was connected in some fashion with organized crime. As we see it, this is exactly the import of Attorney General Younger's release. In other words, we

simply do not believe that the average reader would take the articles to intimate that Kilgore was involved in every—or even necessarily more than one—type of organized criminal activity." (*Id*. at p. 777: accord, *Jennings v. Telegram-Tribune Co* (1985) 164 Cal.App.3d 119, 122, 127 [fair report privilege applied as matter of law to newspaper article describing misdemeanor conviction for failing to file income tax returns as "tax fraud" and "tax evasion"].)

As summarized by the Supreme Court in *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 262, footnote 13, in measuring what constitutes "a 'fair and true report'" the defendant is "permit[ted] a certain degree of flexibility/literary license": """"If the substantial imputations be proved true, a slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently than the actual truth would."""" (*Ibid.*; see *GetFugu*, *Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 154 ["'[m]inor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified,"'"]; *Balzaga v. Fox News Network*, *LLC* (2009) 173 Cal.App.4th 1325, 1337 (*Balzaga*) ["[t]he privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings"].) "In assessing this question, 'the [publications] [are] to be measured by the natural and probable effect [they] would have on the mind of the average reader. [Citations.] The standard of interpretation to be used in testing alleged defamatory language is how those in the community where the [matters] [were] published would reasonably understand [them].'" (*Kilgore v. Younger, supra,* 30 Cal.3d at p. 777; see *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344-345 [a statement is not considered false unless it would have a different effect on the mind of the reader from that which the truth would have produced].)

In evaluating the effect a publication has on the average reader, the challenged language must be viewed in context to determine whether, applying a "totality of the circumstances" test, it is reasonably susceptible to the defamatory meaning alleged by the

13

plaintiff: "'[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole.' [Citation.] 'This is a rule of reason. Defamation actions cannot be based on snippets taken out of context.'" (*Balzaga, supra*, 173 Cal.App.4th at p. 1338; accord, *Hawran v. Hixson, supra,* 209 Cal.App.4th at p. 290 ["[l]ooking to a totality of the circumstances as we must, we examine the allegedly defamatory statements of the September press release, as well as the context in which the press release was issued, to determine whether Hawran satisfied his burden of providing a prima facie showing the press release contains actionable, provably false assertions of fact"].)

Finally, because a defamatory statement (or trade libel) must contain a provable falsehood, mere opinions are not actionable unless the published statement declares or implies a provably false assertion of fact. (*GetFugu, Inc. v. Patton Boggs LLP, supra*, 220 Cal.App.4th at p. 156; *Hawran v. Hixson, supra,* 209 Cal.App.4th at p. 289.) Even if an opinion can be understood as implying facts capable of being proved true or false, however, it is not actionable if it also discloses the underlying factual bases for the opinion and those statements are true. (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471 ["[a]n opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true"]; *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1053 [same].)

    c. *J-M failed to establish a likelihood it would prevail on the merits of its defamation and trade libel claims*

Because J-M conceded the challenged causes of action arose from protected activity, the burden shifted to it to establish it was likely to prevail on its claims for defamation and trade libel. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820.) Liberally construing the fair report privilege, as have prior appellate decisions (see, e.g., *Sipple v. Foundation for Nat. Progress, supra*, 71 Cal.App.4th at p. 240 ["[t]he courts have construed Civil Code section 47, subdivision (d), broadly]"), and mindful of the Legislature's intent in amending subdivision (d) in 1996 "to preserve the scarce resources of California's courts [and] to avoid using the courts for satellite

14

litigation," we conclude J-M failed to establish a probability of prevailing on its defamation and trade libel claims.

In our view, the average reader of the entire three-plus-page press release would reasonably understand the release described the substantial evidence presented at trial detailing J-M's decade-long policy of emphasizing production quotas over quality control, essentially unchallenged by J-M, as well as the specific findings of the jury that J-M knowingly misrepresented its PVC pipe had been manufactured and tested in a manner that assured it had the strength and durability required by applicable industry standards. J-M's attempt to read the press release as inaccurately implying the jury had found specific items of pipe it had provided for underground water systems were defective and had actually failed is predicated on a strained construction of the language used, relies on "snippets taken out of context" and effectively imports into the press release's description of the trial and jury verdict quotations conveying posttrial comments of several government officials.

The press release covers four related, but distinct topics: the trial, the verdict, the legal consequences of the verdict (J-M's potential liability for damages) and the postverdict reaction of several government officials. In arguing the press release is not protected by Civil Code section 47, subdivision (d)'s fair report privilege because it includes criticism of J-M's pipe that goes beyond the jury's specific findings, J-M fails to distinguish among those discrete aspects or to acknowledge the release is as much about the evidence presented at trial concerning J-M's dishonesty in dealing with its government customers and its exposure to a large future award of damages as it is about the actual verdict in this initial phase of the litigation.

The principal focus of J-M's claims for defamation and trade libel is the headline "JM Eagle faces billions in damages after jury finds JM liable for making and selling faulty water system pipes." While the adjective "faulty" considered in isolation could suggest the pipes sold contained manufacturing flaws that made them unserviceable, that inference is not reasonably supportable when the headline is read and considered with the

15

press release as a whole. (See *Balzaga, supra*, 173 Cal.App.4th at p. 1338 ["when the alleged defamatory statement is contained in a headline, the headline must be read in conjunction with the entire article, and when so read the conclusion and inferences alleged by the plaintiff must be supported"]; see also *Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 692 [headline must be read and considered along with the article as a whole]; *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132-1133 [court must examine newspaper's headlines, caption and article as a whole to determine whether it is "reasonably susceptible of a defamatory meaning"].)

The press release reported "[t]he first trial determined whether from 1996 to 2006 JM Eagle lied about whether its pipe met strength and durability standards required by government specifications, thereby making it liable for damages under state and local false claims laws." That statement succinctly and accurately summarized the jury's findings.[5] The press release also explained "the trial focused on those five government entities that were selected from the larger group as 'exemplar' plaintiffs as a way to streamline the trial." It continued, "A separate trial will be held to determine the amount of damages. The date for that trial hasn't been set yet. Although the trial involved just five plaintiffs, all the states, cities and water districts named in the case could share in the damages that are recovered." Again, those statements are both complete and correct. Viewed in the context of these statements, none of which was identified by J-M as defamatory in its first amended complaint or advanced in its opposition to the special motion to strike as a basis for its claims, the headline is a reasonable characterization of

[5] Although the press release accurately stated the industry standards at issue involved long-term strength and durability, the district court included "quality" in its instructions to the qui tam jury—a much broader term connoting overall excellence: "Plaintiffs contend that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards. Plaintiffs contend that this representation was false because J-M did not manufacture or test its pipe in a manner that assured it *uniformly had the quality, strength, or durability* that the applicable industry standards require. . . ." (Italics added.) After being so instructed, the jury found, among other elements required for liability under the governing false claims acts, that J-M's representations of compliance with those standards were false.

16

the jury's findings. To describe the noncompliant and misrepresented pipe sold by J-M as "faulty" or "substandard" falls well within the acceptable margin of flexibility/literary license. (See, e.g., *Jennings v. Telegram-Tribune Co., supra,* 164 Cal.App.3d at pp. 122, 127 [fair report privilege applied as a matter of law to article describing failure to file income tax returns as "tax fraud"; "while perhaps overblown or exaggerated, the terms are easily within the literary license concept of the *Reader's Digest* case"]; *Handelsman v. San Francisco Chronicle, supra,* 11 Cal.App.3d at pp. 387-388 [newspaper's characterization of a complaint for civil conversion as an allegation of "outright theft" was a fair and true report of the complaint].)[6]

J-M also challenges the use of the terms "shoddy manufacturing practices" and "shoddy pipe" in the second and third paragraphs of the press release, again arguing the jury made no such findings. But, contrary to J-M's argument, neither use of the term "shoddy" purported to describe the jury's findings, as opposed to evidence, outlined in the press release, regarding J-M's production methods that pressured its managers to satisfy output requirements without regard to quality standards: "Many witnesses testified that JM Eagle plant managers were under intense pressure to meet production quotas that were impossible to fulfill without cutting corners. Those who failed to meet quotas had their pay docked, and some lost their jobs. If they met the quotas, they could double their monthly salaries. [¶] The quotas created strong incentives to ship bad pipe.

---

[6] The dissent is correct the Court of Appeal in *Handelsman v. San Francisco Chronicle, supra,* 11 Cal.App.3d 381 did not decide as a matter of law that a newspaper report characterizing a complaint for civil conversion as an allegation of "outright theft" was privileged, holding only that the evidence supported the jury's verdict that it was. But neither did the court rule the question of privilege had to be submitted to the jury, as the dissent suggests. The issue on appeal was the unsuccessful plaintiff's contention that as a matter of law the article could not be a fair and true report of the civil complaint. (*Id.* at p. 386.) Rejecting that argument, the appellate court held, "The well recognized rule in this state, as elsewhere, is that the alleged defamatory matter must only be substantially in accord with the report in order to be entitled to the privilege . . . ." (*Ibid.*) That is the principle we have applied in concluding the press release was substantially correct in its pejorative descriptions of J-M's noncompliant and misrepresented pipe.

17

The jury heard many witnesses testify that plant managers routinely removed 'reject' tags from pipe that quality control personnel had identified as failing to meet quality standards. That pipe was then shipped to unknowing customers." Although J-M points out that the evidence at trial was contested, it does not contend these statements are inaccurate summaries of the extensive testimony presented by Phillips & Cohen in support of the plaintiffs' case. Labeling these manufacturing practices and the resulting product "shoddy" is a fair characterization of the trial evidence. No reasonable reader would understand it to be part of the jury's verdict, which was clearly described as limited to false representations regarding uniform compliance with industry strength and durability standards.

As for the observation J-M had a potential exposure of "billions in damages," the press release clearly stated a further trial to determine the amount of damages would be scheduled in the future. Neither the headline nor the press release itself suggested the jury verdict in the first trial had fixed the amount (or range) of damages that could be recovered. Moreover, the press release disclosed the basis for attorney Eric Havian's opinion that damages could potentially be in the billions of dollars: The various governmental entities involved in the lawsuit had spent $2.2 billion to buy J-M pipe during the 10-year period at issue; and a damage award would properly compensate the plaintiff entities for a portion of the original acquisition price of the misrepresented pipe, plus the cost to replace pipe sooner than expected. (Even this last point did not imply that the pipe needed to be replaced immediately, as J-M contends, only sooner than the 50-100 years anticipated by the industry's durability standard to which J-M had falsely certified.) The press release illustrated those damage concepts by noting that one of the plaintiffs "has already spent millions of dollars to replace fairly new JM Eagle water pipes that failed, despite being considered 'hundred-year pipe'" and a second had "also experienced a catastrophic failure of JM Eagle pipe that required extensive repairs." J-M does not question the accuracy of either of those statements. Although J-M correctly observes the finding of liability did not technically mean any plaintiff was "entitled" to

18

damages in the further proceedings, the statement that J-M was now at risk that the government entities involved in the lawsuit would recover very large, but-as-yet-undetermined damage awards was a thoroughly fair summary of the status of the litigation.  Havian's estimate that damages could potentially total billions of dollars was nonactionable opinion based on unchallenged information disclosed in the press release itself.  (See *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696 [whether a statement is actionable fact or nonactionable opinion is ordinarily a question of law for the court]; *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 387 ["'[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning"].)

Similarly, Havian's observation, plainly identified as such, that the verdict reflected the jury's decision "that JM Eagle management cared only about the amount of pipe JM produced, not the quality of that pipe" represents fair comment on the evidence of J-M's manufacturing practices and Havian's opinion regarding the basis for the jury's rejection of J-M's contention it had manufactured and tested its pipe in accordance with applicable quality, strength and durability requirements.

To be sure, the press release includes, in a separate section denominated "comments from government officials," statements from the Nevada and Virginia Attorneys General reporting that the PVC pipe their states had purchased from J-M had already failed.  Although Phillips & Cohen would be responsible for republishing those remarks in its press release if they were actionable, J-M does not claim they are untrue; and, while part of the context for the discussion of the trial and jury verdict in the press release, no reasonable reader could conclude those comments purported to describe the jury's verdict in the case.

In sum, Phillips & Cohen may be guilty of self-promotion and puffery; but its description of the evidence at trial and the jury's special verdict in the November 15, 2013 press release falls comfortably within the permissible degree of flexibility and literary license afforded communications to the media concerning judicial proceedings.

19

The substance of its report was accurate.  The release was absolutely privileged under Civil Code section 47, subdivision (d).

## DISPOSITION

The order denying the special motion to strike under section 425.16 is reversed. The cause is remanded to the trial court with directions to enter a new order granting the motion and dismissing the complaint and to conduct further proceedings to determine the amount of attorney fees and costs to be awarded Phillips & Cohen as the prevailing party on the motion.  Phillips & Cohen is also to recover its attorney fees and costs on appeal in an amount to be determined by the trial court.


                                        PERLUSS, P. J.


    I concur:



        ZELON, J.


20

BLUMENFELD, J.[*], Dissenting.

After strenuously, repeatedly, and successfully arguing at trial that the case was not about the quality of the pipes sold by J-M Manufacturing Company, Inc. (J-M), and after obtaining a jury verdict based on its argument that it did not have to prove that a single piece of pipe was faulty, Phillips & Cohen published a press release touting that the jury had found J-M liable "for making and selling faulty water system pipes." The headline read in full: "[J-M] faces billions in damages after jury finds [J-M] liable for making and selling faulty water system pipes." The headline framed the story, which Phillips & Cohen then proceeded to tell with lawyer-like skill, crafting a press release manifestly designed to convey an impression of bursting pipes and crushing liability.

The majority concludes that the press release is a fair and true report of the jury verdict as a matter of law. I respectfully disagree with that conclusion for three reasons. First, when a publication is susceptible of a defamatory meaning, jurors rather than judges must decide the question. An average reader readily could perceive the press release to mean what Phillips & Cohen set out to communicate. Second, the question whether a publication is susceptible of a defamatory meaning depends on the totality of the circumstances. That is, the meaning of challenged statements must be viewed in the context of the entire publication to gauge the probable impact of the communication on the average reader. Under this test, the press release cannot be divided into several distinct parts (Maj. opn. *ante*, at p. 15), as this results in minimizing the troubling statements and overlooking their contribution to the overall story. Third, the literary license doctrine did not permit Phillips & Cohen to falsely insinuate that the jury had found J-M's pipes to be defective. This important doctrine provides breathing space for freedom of expression, but it does not operate to smother protections afforded by the defamation laws.

In the end, the majority finds that "Phillips & Cohen may be guilty of self-promotion and puffery"—but nothing else. (Maj. opn. *ante*, at p. 19.) Perhaps. I believe, however, that any such verdict should be rendered by a jury. Like the trial judge in this

case, I would hold that an average reader could interpret the press release to mean precisely what the headline stated: "[The] jury [found J-M] liable for making and selling faulty water system pipes." For this reason, I would affirm the trial court and allow a jury to decide whether Phillip & Cohen's press release was a fair and true report. Therefore, I respectfully dissent.

I

Before analyzing the defamation and trade libel claims, it is important to understand not only what the jury decided in the federal lawsuit, but also what the jury did not decide in that case. A proper understanding of the jury verdict exposes the defamatory nature of the press release.

A

The federal lawsuit was a qui tam action involving J-M's certification to government entities that the pipes sold conformed to two industry standards—one established by the American Water Works Association (AWWA) and the other established by the Underwriters Laboratories (UL). The focus of the standards is on strength and durability with the goal of producing pipes with an expected life span of 50 to 100 years. To satisfy the standards, J-M was required to manufacture its pipes using a process designed to achieve uniform compliance.

At the repeated urging of Phillips & Cohen, the liability phase of the trial of the qui tam action had a narrow scope. The court's bifurcation order explained Phillips & Cohen's theory of the case: "J-M falsely represented that (a) *all* (not just some) J-M pipe satisfied the requirements, rules, and standards of [AWWA and UL] . . . ; and (b) *all* (not just some) of the pipe was manufactured in a substantially identical manner to the pipe that was originally determined to comply with the standards. . . ." The jury instructions also explained the limited focus of the trial: "Plaintiffs contend that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards. Plaintiffs contend that this representation was false

2

because J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require."

The jury was not asked to consider whether J-M manufactured and sold faulty pipes. Phillips & Cohen told the district court that the plaintiffs "never considered [pipe] failures to be a big part of this case," and that "the question before the jury was not [whether] the pipe [is] defective, it was not whether the pipe failed, the question before the jury is were the defendants . . . truthful . . . ." Phillips & Cohen told the jury the same thing. In its rebuttal closing argument, Phillips & Cohen bristled at defense counsel's suggestion that the case was about "substandard products," arguing: "So let me start with the thing that [defense counsel] just told you that I was absolutely stunned to hear. He told you there's no evidence the plaintiffs here got substandard pipe so they shouldn't recover. . . . Ladies and gentlemen, look at the jury instructions. The court will never instruct you anywhere that we have to show we got substandard pipe. This is not a products liability case. This is a False Claims Act case. All we need to show is that J-M misrepresented its products to our clients . . . . It is about false statements. It is not . . . about substandard products and we do not have to show that . . . to prevail."

Phillips & Cohen was successful in framing the issue before the district court and persuading the jury that it should prevail on the issue as framed. At the end of the first phase of the trial, the jury rendered a special verdict in favor of the plaintiffs, concluding that J-M submitted false claims to the five representative plaintiffs. Significantly, the special verdict form required the jury to explain why the claims were false. The jury specifically disclosed its finding: "[J-M] falsely represented uniform compliance with AWWA [C900 and] C905 and UL 1285."[1]

---

[1] In proving that J-M falsely certified compliance with the industry standards, the plaintiffs did not produce evidence that any of their pipes failed to comply with those standards. On the contrary, they acknowledged that they could not do so because their pipes were buried underground and unavailable for strength testing. Instead, the plaintiffs sought to prove that the certifications were false by focusing on J-M's warranties about uniform compliance in the manufacturing and testing processes.

The jury did not make any other findings, let alone that J-M had made and sold faulty pipes. In fact, even after the verdict, Phillips & Cohen emphasized the narrow limits of the jury's decision. In opposing J-M's post-trial motions, Phillips & Cohen argued that the jury decided that J-M's statements were false because J-M did not achieve "uniform compliance" with the AWWA and UL standards in manufacturing the pipe. Phillips & Cohen conceded that it did not show that the pipes the plaintiffs received fell below the AWWA and UL standards, but reminded the district court of its earlier finding that the plaintiffs were only required to "'show that [compliance is] less than 100 percent'" in manufacturing the pipe. (Italics omitted.) The district court did not require the plaintiffs to "'prove that [the plaintiffs'] pipe is substandard.'"

Phillips & Cohen also explained the significance of J-M's false claim of uniform compliance. "What [the] [p]laintiffs purchased, J-M promised, and the standards guaranteed was a regime of overall consistency in which the customer can have confidence that the pipe's long-term strength and durability is no less than the qualifying samples." The lack of uniform compliance "deprived [the] [p]laintiffs of the assurance of quality [that] they had contracted for" and caused their pipes to face a "heightened risk of premature failure." In other words, the lack of uniform compliance increased the risk that the plaintiffs may have obtained non-compliant pipes, and if the plaintiffs did receive non-compliant pipes, this would increase the risk that those pipes might fail prematurely.

So what was the risk that the plaintiffs had bought non-compliant pipes? The jury did not say. And what was the risk of a premature failure if the plaintiffs had purchased non-compliant pipes? The jury did not say. Did the jury at least say that the effect of noncompliance would be to reduce the expected life of the pipe by no less than one year—from 50-100 years to 49-99 years? The jury did not say. Nor did the jury have any way of knowing, because the plaintiffs did not introduce evidence that would have permitted an informed answer to all these questions.

4

B

Despite the narrow findings of the jury, Phillips & Cohen issued a press release the day after the verdict that described those findings in broad-sweeping terms. According to the headline: "[J-M] faces billions in damages after jury finds [J-M] liable for making and selling faulty water system pipes." After describing the jury's findings in unmistakable language, Phillips & Cohen repeatedly used words that reinforced the headline about faulty pipes, referring to J-M pipes as "'substandard,'" "'shoddy,'" "bad," and in need of replacement "much sooner than expected" after "a decade of failing test results."

The press release stated that "[a] federal jury unanimously agreed last night that [J-M] . . . knowingly manufactured and sold to government entities substandard plastic pipe that was used in water and sewer systems in various states around the country—opening [J-M] up to potentially billions of dollars in damages. [¶] . . . The trial exposed [J-M's] deliberate efforts to cut costs by using shoddy manufacturing practices to make weaker but more profitable polyvinyl chloride (PVC) pipe." According to the press release, "'States and water districts that are covered by this lawsuit spent $2.2 billion to buy [J-M pipe] during the 10-year period [J-M] was lying about the long-term strength of the pipe,' said Eric Havian, an attorney with Phillips & Cohen . . . . 'Those entities now are entitled to recover a substantial portion of that cost plus the cost to replace the shoddy pipe much sooner than expected. This likely will mean damages could total billions of dollars because it's expensive and disruptive to replace water pipe.' [¶] . . . [¶] '[J-M] defrauded its customers for 10 years,' Havian continued. 'The jury decided that [J-M] management cared only about the amount of pipe [J-M] produced, not the quality of that pipe. [J-M] deceived outside inspection agencies and ignored over a decade of failing test results. . . .'"

The press release then reported comments about the jury verdict from four high-ranking officials from different states. The Nevada Attorney General stated: "'The PVC pipe has already failed across the Silver State and will have to be replaced sooner than

5

expected . . . . We know from firsthand experience that this PVC pipe will prematurely leak or break and can jeopardize lives. Today's verdict demonstrates that manufacturers cannot get away with fraud that puts lives at risk. . . .'" The Virginia Attorney General stated: "'The trial showed the company's attempt to cut costs with shoddy manufacturing practices resulted in weaker PVC pipes, which ended up leaking and costing Virginia localities millions to repair or replace. . . .'" The New Mexico Attorney General stated: "'[J-M] defrauded New Mexico taxpayers when [it] sold us sub-standard products that jeopardize our citizens' access to clean drinking water. . . .'" The San Diego City Attorney praised the verdict for holding J-M "'accountable for supplying substandard products to our city.'"

The remaining part of the press release described the trial. It referred to the case as a "whistleblower lawsuit" that was divided into two phases and explained: "The first trial determined whether from 1996 to 2006 [J-M] lied about whether its pipe met strength and durability standards required by government specifications, thereby making it liable for damages under state and local false claims laws." "A separate trial will be held to determine the amount of damages" for the costs to replace failed pipes and to replace pipes sooner than expected.

## II

The critical question in this case is whether this court can conclude *as a matter of law* that the press release is privileged as a fair and true report. (Civ. Code, § 47, subd. (d).) Under well-established authority, a jury must decide this privilege issue unless the undisputed facts permit "but one conclusion"—i.e., the press release is not susceptible of a defamatory meaning in the mind of an average reader. (*Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 326; see *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546 (*MacLeod*) ["Whether or not the article is reasonably susceptible of this interpretation is a question for the court and, if so, whether or not it was so understood is a question for the jury"].) The majority acknowledges this

6

principle, but ultimately departs from it.  This departure marks a substantial expansion of the role of a court in deciding defamation cases.

The court in *Frisk* articulated the principle well:  "[T]he cases uniformly hold that even though a [defendant] in the first instance establishes the existence of a privileged occasion for a defamatory publication, he may nevertheless be subject to liability if [the] plaintiff persuades the fact finder that the occasion was abused.  *The question of whether a privileged occasion was abused is for the determination of the jury* unless the facts permit but one conclusion.  [Citations.]"  (*Frisk v. Merrihew*, *supra*, 42 Cal.App.3d at p. 326.)  This has long been the law in California.  (*MacLeod*, *supra*, 52 Cal.2d at p. 546; see *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 398 ["'whether or not a privileged occasion exists is for the court to decide, while the effect produced by the particular words used in an article [or broadcast] and the fairness of the report is a question of fact for the jury'"]; *Pierce v. San Jose Mercury News* (1989) 214 Cal.App.3d 1626, 1634 ["Where . . . reasonable minds could disagree on what is fair, the issue is a question of fact to be determined by the jury"]; *Handelsman v. San Francisco Chronicle* (1970) 11 Cal.App.3d 381, 386 ["The applicable law in California is that whether or not *a privileged occasion exists* is *for the court* to decide, while the effect produced by the particular words used in an article and *the fairness of the report* is a question of fact *for the jury*"]; accord, *Jennings v. Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119, 128 [privilege issue can only be decided as a matter of law if the average reader would not understand the publication to have the meaning asserted by the plaintiff].)

The majority suggests that the court-jury divide strongly tilts in the court's direction.  It states that while the privilege issue "may properly be left to a jury in some instances, appellate courts have not been reluctant to decide the fair report privilege applies as a matter of law when the undisputed facts are insufficient to support a judgment for the plaintiff."  (Maj. opn. *ante*, at p. 12.)  For this proposition, the majority cites two distinguishable cases that correctly found the privilege applied as a matter of law.  In *Kilgore v. Younger* (1982) 30 Cal.3d 770, 774, 777, two newspapers accurately

7

noted that the plaintiff was listed in the California Attorney General's report as one of 92 individuals who were suspected of having engaged in a variety of organized criminal activity.  The court rejected the plaintiff's contention that, for the privilege to attach, the newspapers had to identify his specific activities to avoid the implication that he was involved in every single criminal activity that happened to be mentioned in the report.  In *Jennings v. Telegram-Tribune Co.*, *supra*, 164 Cal.App.3d at p. 122, a newspaper reported that the plaintiff was convicted of "'tax fraud'" and "'tax evasion,'" when describing his misdemeanor plea to knowingly failing to file income tax returns for years on more than $400,000 in income.  The court found the article was privileged as a matter of law because it accurately described the gist of the criminal proceeding.  (*Id*. at p. 127.)  Thus, *Kilgore* and *Jennings* properly concluded that the facts in those cases were susceptible of a privileged interpretation only.

Where, as here, the facts are susceptible of a nonprivileged interpretation, a court may not decide the case as a matter of law.  Indeed, courts have allowed juries to decide privilege questions in cases with publications far less troubling than the press release here.  In *Handelsman*, for example, a newspaper reported on a civil complaint that had been filed against the plaintiff in San Mateo, charging that he and others had conspired to convert union dues to their own use.  The plaintiffs sued the newspaper for describing the civil complaint as having accused him of "'outright theft.'"  (*Handelsman v. San Francisco Chronicle*, *supra*, 11 Cal.App.3d at p. 387).  The court did not decide as a matter of law that the newspaper article was a fair and true report of the civil action filed against the plaintiff.  Instead, the jury was allowed to decide this question and found the privilege attached.  (*Id*. at p. 386.)  On the plaintiff's appeal, the court affirmed the judgment for the newspaper, stating:  "[A]lthough the San Mateo action is civil in nature, the use of the criminal term 'theft' in describing the facts alleged in the complaint might well be within the ambit of fair reporting.  At least, the court is not inclined to hold that the reporting was not fair as a matter of law."  (*Id*. at p. 388.)

*Handelsman* does not stand alone. (See also *MacLeod*, *supra*, 52 Cal.2d at p. 547 [jury could find that the newspaper insinuated the "plaintiff was unworthy of public office because he was a communist sympathizer"]; *Burrill v. Nair*, *supra*, 217 Cal.App.4th at p. 398 [jury must decide the privilege question because the average listener might understand the gist of the broadcast to have a defamatory meaning]; *Pierce v. San Jose Mercury News*, *supra*, 214 Cal.App.3d at p. 1634 ["Where, as here, reasonable minds could disagree on what is fair, the issue is a question of fact to be determined by the jury"].)

## III

Phillips & Cohen argues that the press release is a fair and true report as a matter of law by misapplying controlling principles of interpretation. In the name of the totality of the circumstances test, Phillips & Cohen urges a "divide and conquer" approach that distorts rather than illuminates the effect of the entire story. In the name of the literary license doctrine, Phillips & Cohen requests a level of "flexibility" that stretches the doctrine beyond its intended limits.

## A

To qualify as a fair and true report of an official proceeding, a publication must "capture[] the gist or sting of the statements made" therein. (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337.) When a plaintiff claims that the report is defamatory, "the courts apply a totality of the circumstances test to review the meaning of the language in context and whether it is susceptible of a meaning alleged by the plaintiff." (*Ibid.*) In applying this test, a court must remember that "the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." (*MacLeod*, *supra*, 52 Cal.2d at pp. 547, 551.) Equally important to remember is that "[a] defendant is liable for what is insinuated, as well as for what is stated explicitly." (*Ibid.*)

9

The totality of the circumstances test is deeply rooted in the law. The purpose of the test, in all its applications, is to try to see the entire picture by considering all the relevant facts collectively. Once the picture emerges, the question is whether the applicable standard has been met. Translated here, the test requires a court to consider the challenged statements in the context of the entire publication to determine the natural and probable effect on the average reader. (*Balzaga v. Fox News Network, LLC*, *supra*, 173 Cal.App.4th at p. 1337.) A defendant in a defamation case is only entitled to judgment as a matter of law if a court, after correctly applying the totality of the circumstances test, can declare that the probable effect is unquestionably nondefamatory. (*Id*. at p. 1339; accord, *MacLeod*, *supra*, 52 Cal.2d at p. 547.)

A proper application of the test precludes what the United States Supreme Court has rejected as a "divide-and-conquer analysis." (*United States v. Arvizu* (2002) 534 U.S. 266, 274 [122 S.Ct. 744, 151 L.Ed.2d 740].) Such an analysis is irreconcilable with the test because it serves to undermine it, producing distortion rather than clarity. The majority appears to employ this analysis, stating: "The press release covers four related, but distinct topics: the trial, the verdict, the legal consequences of the verdict (J-M's potential liability for damages) and the postverdict reaction of several government officials." (Maj. opn. *ante*, at p. 15.) The division of the press release into four distinct parts has the effect of isolating and minimizing the false statements.

Starting with the headline, the majority states that "the adjective 'faulty' considered in isolation could suggest the pipes sold contained manufacturing flaws that made them unserviceable." (Maj. opn. *ante*, at p. 15.) This is more than a suggestion: it is the plain meaning of the story's headline. Yet the majority concludes that "the headline is a reasonable characterization of the jury's findings" because the body of the press release contains some correct statements. (Maj. opn. *ante*, at pp. 16-17.) Specifically, the press release noted that the jury determined that J-M had "lied about whether its pipe met strength and durability standards," that "the trial focused on those . . . five government entities that were selected from the larger group," and that "[a]

10

separate trial will be held to determine the amount of damages." This is the entire context upon which the majority relies in declaring the headline to be accurate. But the fact that J-M "lied about whether its pipe met strength and durability standards" reasonably could be construed as adding rather than subtracting a fact—i.e., J-M not only sold the government faulty pipes, but it lied to the government about them as well. The other general facts about the trial—that it focused on five government entities and contained a separate damages phase—do nothing to erase the headline's plain meaning.

Phillips & Cohen also claimed that "[t]he trial exposed" J-M's "shoddy manufacturing practices" that produced "shoddy pipe." According to the majority, those terms described the trial evidence rather than the jury's verdict. But an average reader reasonably would have understood the jury's verdict to have been based on the evidence. Aside from missing the connection between the evidence and the verdict, this analysis also overlooks the nexus between the headline and the body of the story. The body's description of "shoddy pipe" served to fortify the impression created by the headline's description of "faulty water system pipes." The same is true for the other parts of the press release, including the reference to "billions of dollars in damages" for manufacturing and selling faulty pipes, the statement that J-M did not care about "the quality" of its pipes, and the reports of failing water systems from government officials.

Under a proper application of the totality of the circumstances test, the press release readily can be understood to mean what its headline plainly stated. The headline introduced the story, informing the reader that he or she will be reading about a jury verdict finding J-M liable for "making and selling faulty water system pipes," thereby exposing J-M to "billions of dollars in damages." Phillips & Cohen then developed that general theme throughout the press release. The first sentence stated: "A federal jury unanimously agreed last night that [J-M] . . . manufactured and sold to government entities substandard plastic pipe that was used in water and sewer systems . . . ." In selecting the word "substandard," Phillips & Cohen knew exactly what it was doing. In closing argument to the jury, Phillips & Cohen claimed that it was "absolutely stunned"

11

to hear any reference to "substandard" pipes. Worried about the probable effect of the use of this word on the jury, Phillips & Cohen strenuously reminded the jurors: "This is not a products liability case. . . . It is not . . . about substandard products . . . ." Clearly, Phillips & Cohen understood the implication of calling pipes "substandard" even before a jury that had received weeks of education about the False Claims Act and industry standards, and even without a prior thematic reference to the pipes as being "faulty."

Not content with the use of the word "faulty" in the headline and "substandard" in the first sentence, Phillips & Cohen continued in the next few paragraphs to create an image of defective pipes by stating that J-M used "shoddy manufacturing practices to make "weaker" and "shoddy pipe" that will have to be replaced "much sooner than expected." Phillips & Cohen then gave an example of what it was talking about: "For instance, [a municipal water district in California] had to spend $4 million to replace [J-M] pipe after the water pipe that was part of one project broke and leaked seven times." Yet the majority concludes that an average reader could not understand the press release to suggest that J-M pipe was defective, but only that the pipe might have to be replaced "sooner than the 50-100 years anticipated by the industry's durability standard to which J-M had falsely certified." (Maj. opn. *ante*, at p. 18.) Given that the press release never explained the significance of the industry standards as found by the jury, this conclusion demands an awful lot from an average reader.[2]

But Phillips & Cohen was not done spinning its story. After giving an example of a failing water system caused by faulty pipes, the press release explained that "'[t]he jury decided that [J-M] cared only about the amount of pipe [it] produced, not the quality of

_____

[2]      The press release referred only in passing to "'hundred-year pipe.'" Even then, the reference merely served to reinforce the theme of defective and failing pipes, stating that one of the plaintiffs "has already spent millions of dollars to replace fairly new [J-M] water pipes that failed, despite being considered 'hundred-year pipe.'" The press release then stated that J-M had created incentives for its employees to deliver "bad pipe," and that "plant managers routinely removed 'reject' tags from pipe that quality control personnel had identified as failing to meet quality standards."

12

that pipe.'"  In the very next sentence, the press release informed the reader that J-M "'ignored over a decade of failing test results.'"  The juxtaposition of these two sentences was as clever as it was clear:  Phillips & Cohen was insinuating that J-M has been manufacturing defective pipes that have been failing tests for over a decade.

And if the insinuation were not obvious enough, Phillips & Cohen—taking no chances that its intended message would be lost on the average reader—offered testimonials from various government officials about their allegedly faulty pipes.  Before turning to the testimonials, the press release noted:  "Nevada was one of the largest purchasers of [J-M] pipe and experienced many failures of that pipe."  The Nevada Attorney General was then quoted to say that the "'pipe has already failed across the Silver State and will have to be replaced sooner than expected,'" and that she "'know[s] from firsthand experience that this PVC pipe will prematurely leak or break and can jeopardize lives.'"  The Virginia Attorney General was next quoted about having bought "'substandard pipes for their water and sewer systems'" and explained:  "'The trial showed the company's attempt to cut costs with shoddy manufacturing practices resulted in weaker PVC pipes, which ended up leaking and costing Virginia localities millions to repair or replace.'"  The remaining officials repeated the same theme that J-M had sold a defective product that endangered the health and safety of their communities.

B

Having distorted the jury's findings, Phillips & Cohen cannot seek refuge in the literary license doctrine.  That doctrine does not permit Phillips & Cohen to falsely suggest that the jury found J-M pipe to be faulty or defective.

A report is fair and true if it accurately describes the substance, or gist, of the reported matter.  (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 262, fn. 13.)  A publisher is not required to quote the source of the information verbatim.  (*Ibid.*)  In this sense, a publisher has a "literary license" to use words that fairly and accurately express the meaning of what was stated or done.  (*Ibid.*)  The need for this license is obvious:  a reasonable amount of ""'breathing space''" is necessary to protect

13

freedom of expression. (*Id*. at p. 261.) The limits of this license are equally obvious: the license does not justify altering or distorting the gist of the matter reported on. (*Id*. at p. 262, fn. 13.) The line is crossed if the publication is such a departure that it "'"produce[s] a different effect" on the reader.'" (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351.)

A reasonable jury could find that Phillips & Cohen crossed that line here. As discussed, the press release did not merely use exaggerated language in an otherwise accurate description of what the federal jury had found. Rather, Phillips & Cohen used language to create a false impression of the jury's findings by manipulating language and interlacing truth with fiction. In doing so, Phillips & Cohen strayed far from the limited reach of the license. (See *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975-976 [applying the doctrine after noting that the report was "completely accurate" and that the license authorizes "a degree of flexibility" so that "[t]he reporter is not bound by the straitjacket of the testifier's exact words"].) Granting a license to Phillips & Cohen in these circumstances thus comes at a considerable cost— namely, the weakening of the protections afforded by the defamation laws.

IV

Phillips & Cohen published a press release that sought to convey indirectly, if not directly, that a jury had found that J-M's pipes were defective. The press release, as a whole, is anything but subtle: the headline sets the narrative and the body feeds it. The legal artistry appeared in the words chosen in the body and the accompanying use of testimonials. But such artistry, achieved by selective use of language designed to skirt around the edges of the law of defamation, is not sufficient to avoid the consequences of the clearly insinuated message. (*MacLeod*, *supra*, 52 Cal.2d at pp. 550-551.)

Justice Traynor long ago cautioned against allowing this type of linguistic manipulation: "Such hair-splitting analysis of language has no place in the law of defamation, dealing as it does with the impact of communications between ordinary human beings. It is inconsistent with the rule that 'the publication is to be measured not

14

so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.' [Citation.] It protects, not the innocent defamer whose words are libelous only because of facts unknown to him, but the clever writer versed in the law of defamation who deliberately casts a grossly defamatory imputation in ambiguous language." (*MacLeod*, *supra*, 52 Cal.2d at pp. 550-551.)

By escaping a trial in this case—and thus even the potential for liability—Phillips & Cohen has paved a path for those who wish to follow. Because I believe that this is the wrong path, I respectfully dissent.


BLUMENFELD, J. *

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.