Filed 7/3/25  Awakend v. New U Life CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AWAKEND, LLC, et al., | |
| Plaintiffs and Respondents, | G063309 |
| v. | (Super. Ct. No. 30-2022-01298921) |
| NEW U LIFE CORPORATION et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Randell L. Wilkinson, Judge. (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Rome, Eugene Rome, Brianna Dahlberg; Parsons Behle & Latimer and Erik A. Christiansen for Defendants and Appellants.

Danelle Meoli, in pro. per.; Wellman & Warren, Scott Wellman and Chris Wellman for Plaintiff and Respondent Danelle Meoli.

Smith, John S. Clifford, Celeste Levin; Wellman & Warren, Scott Wellman and Chris Wellman for Plaintiffs and Respondents Awakend, LLC and Rodney James.

New U Life Corporation (New U Life), Alexy Goldstein, Katherine Garfield, Joe Juliano, and Christopher Cavedon (collectively, defendants) appeal from an order denying in part a special motion to strike under Code of Civil Procedure section 425.16 (all undesignated statutory references are to this code). Known as the anti-SLAPP statute, section 425.16 was enacted to address "'a disturbing increase' in strategic lawsuits against public participation (SLAPPs): 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1242 (*Geiser*).) Defendants argue they engaged in protected activity under section 425.16, subdivision (e)(3) and (4). They contend the trial court erred by overruling certain evidentiary objections. They also argue the court erred in refusing to strike a few claims because of insufficient evidence. We disagree and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

I.

COMPLAINT

In December 2022, Awakend, LLC (Awakend), Rodney James, and Danelle Meoli (collectively, plaintiffs) filed a complaint against defendants and Does 1 through 25. Plaintiffs alleged the following.

New U Life is a multi-level marking business (MLM) "that manufactures and sells dietary supplements." Its owner and chief executive officer is Goldstein. New U Life markets and sells its products via independent distributors. These independent distributors earn their money

2

under a "'Compensation Plan,'" which gives commissions and bonuses according to sales volume and sales of distributors under them. Distributors aligned with a particular distributor are considered members of that distributor's "'downline organization.'"

Meoli was a former New U Life distributor. She was one of the top earners for nearly five years, "was considered the 'face of the company,'" and served as "a member of the [New U Life] 'Advisory Board.'" She had roughly 600,000 distributors spanning across nine countries.

In March 2022, Meoli established her own MLM business with James called Awakend. Awakend sells a weight-loss product. Since its founding, Awakend has gained approximately 40,000 customers and distributors and earned approximately $5,000,000 a month on average in revenue.

When New U Life discovered Meoli and James were starting a competing business, New U Life began a "campaign of defamation" against them, as several New U Life distributors were considering leaving New U Life for Awakend. In August 2022, New U Life entered into a settlement agreement with Meoli and James to allow for an "amicable separation." The settlement agreement contained a non-disparagement provision.

After the settlement agreement, though, New U Life started "another campaign of defamation," this time targeting Awakend. New U Life held daily strategy meetings to discuss plans to undermine Awakend's business. Goldstein and top New U Life distributors, including Garfield, Juliano, and Cavedon, participated in these meetings. Defendants used "derogatory language" while discussing Meoli and James, calling her "'the cunt' or 'the bitch'" and him "'the pedophile,' 'the rapist,' and/or 'the criminal.'" Defendants also contacted Awakend and New U Life distributors,

3

claiming "Meoli was a liar who should not be trusted because she was associated with James" and sharing false information regarding James being a "'pedophile'" who "'served time in prison'" and being "'a rapist.'"

Goldstein also paid and instructed New U Life employees, including Shawn Spainhour (New U Life's director of digital marketing at the relevant times), to write articles featuring Awakend that were false. These articles described Awakend as "an 'illegal pyramid scheme'" and "a 'scummy cash grab' intended to defraud consumers." They called Meoli "a 'liar.'" They claimed Awakend was illegally selling its product because it did not own the rights to the formula. After the articles were written, Goldstein directed Garfield, Juliano, and Cavedon to share them with Awakend distributors by direct messaging on social media platforms or creating fake Facebook profiles and "commenting publicly on Awakend's distributor Facebook pages." Goldstein also directed Garfield, Juliano, and Cavedon "to submit the articles to a [Web site] called '[BehindMLM],' . . . a reputable organization that shares information about MLM companies in the industry." Once BehindMLM published these articles on its Web site, thousands of Awakend distributors were able to see them.

After BehindMLM published these articles, Garfield, Juliano, and Cavedon shared the articles to Awakend distributors. Additionally, defendants "conspire[ed] with third party 'Youtubers' to make and publish videos about Awakend, which would claim the same false information contained in the articles."

Based on these factual allegations, the complaint alleged six causes of action: (1) defamation per se—slander (by plaintiffs against defendants and Does 1 through 25); (2) defamation per se—trade libel (by Awakend and Meoli against defendants and Does 1 through 25); (3) tortious

4

interference with prospective economic advantage (by Awakend against defendants and Does 1 through 25); (4) tortious interference with contractual relationship (by Awakend against defendants and Does 1 through 25); (5) breach of contract (by Meoli and James against New U Life and Does 1 through 25); and (6) civil conspiracy (by plaintiffs against defendants and Does 1 through 25).

## II.

## ANTI-SLAPP MOTION

In February 2023, defendants moved to strike the complaint in its entirety. As to the second through sixth causes of action, they argued they engaged in protected activity under section 425.16, subdivision (e)(3) by publishing statements on Facebook, YouTube, and the BehindMLM Web site. They also asserted, as to all the causes of action, they engaged in protected activity under section 425.16, subdivision (e)(4). Defendants contended plaintiffs would be unable to show a probability of prevailing on the merits.

In support of its motion, defendants provided declarations of Goldstein, Spainhour, Brianna Dahlberg (New U Life's counsel), and Oz (the pseudonymous author and editor of the BehindMLM Web site).

Plaintiffs opposed the anti-SLAPP motion and filed evidentiary objections. They argued section 425.16, subdivision (e)(3) did not apply because defendants failed to demonstrate how the Facebook pages or YouTube videos were open to the public. Plaintiffs also argued the defendants did not engage in protected activity under section 425.16, subdivision (e)(3) because they themselves did not publish the articles on BehindMLM. They contended none of defendants' statements was made "in connection with an issue of public interest," and thus section 425.16, subdivision (e)(3) and (4) was inapplicable. Plaintiffs asserted, even if their claims arose from

5

defendants' protected activity, they would be able to demonstrate a probability of prevailing on the merits.

In support of their opposition, plaintiffs provided declarations of Patrick Smith (a former New U Life distributor), Jeffrey K. Warwick (a licensed attorney in Louisiana and Utah), Maggie Rexford (a New U Life distributor), James (Awakend's chief executive officer), Chris Wellman (plaintiffs' counsel), Meoli (Awakend's chief sales officer), and Kenton Engel (a contractor for New U Life).

Defendants filed a reply. It submitted declarations of Vanessa B. Pierce (New U Life's in-house counsel), Jeffrey C. Corey (New U Life's counsel), and Dahlberg. Defendants also filed evidentiary objections.

After a hearing, the trial court granted in part and denied in part the anti-SLAPP motion. It granted the motion as to two claims—tortious interference with contractual relations and breach of contract based on the publication of articles on the BehindMLM Web site—but denied the motion as to the remaining claims. The trial court sustained and overruled evidentiary objections by defendants. It also sustained plaintiffs' first evidentiary objection and overruled their remaining objections.

At step one of the anti-SLAPP analysis, the trial court concluded defendants' statements on social media did not qualify for protection under section 425.16, subdivision (e)(3), but the articles published on BehindMLM's Web site did. The court observed defendants' conduct could be divided into two categories: "(i) 'statements and/or writings that [plaintiffs] allege were published on [I]nternet platforms, including Facebook, YouTube, and the BehindMLM [Web site],' including direct communications to distributors through social media and Facebook; and (ii) the rest – that is, oral statements made directly to distributors." The court explained defendants submitted no

6

evidence that the statements on social media platforms were "open to the public"; thus, these statements were not made in a public forum. However, the court found "the statements published on BehindMLM were statements made in a public forum." And it determined these statements on BehindMLM were made in connection with a public interest: "[S]tatements about whether Awakend is a pyramid scheme or has the rights to the product it sells are of public interest within the community of MLM distributors and others in the MLM industry. Plaintiffs themselves allege there is such an industry. . . . Similarly, statements about Meoli's reliability and truthfulness in connection with the founding and operation of Awakend would be a matter of public interest to the same group. [¶] Statements about James, however, are not in the public interest as he has no public profile (on the record provided) in connection with MLM." The trial court found section 425.16, subdivision (e)(4) did not apply to the other challenged statements because they did not contribute to the public debate.

At step two, the trial court examined whether plaintiffs would be able to show a probability of prevailing on the merits. As to the first cause of action for slander, the court denied the motion because the first cause of action did not arise from the protected activity, the BehindMLM articles. It concluded plaintiffs established a probability of prevailing on the merits on their trade libel, tortious interference with prospective economic advantage, and civil conspiracy claims based on the BehindMLM articles; thus, the court denied the motion as to these claims. Concerning the tortious interference with contractual relations and breach of contract claims based on the BehindMLM articles, the court found plaintiffs had not shown a likelihood of prevailing on the merits and granted the motion as to these claims.

Defendants timely appealed.

## DISCUSSION

## I.

### ANTI-SLAPP LEGAL FRAMEWORK AND STANDARD OF REVIEW

The anti-SLAPP statute aims to shield defendants from "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) To curb such abuses of the civil justice system, "the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1).)" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) The statute must "be construed broadly." (§ 425.16, subd. (a).)

Courts evaluate anti-SLAPP motions through a two-step process. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) First, "the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061, quoting § 425.16, subd. (b)(1); see § 425.16, subd. (e) [defining protected activity].) Second, if the defendant satisfies the first step, the plaintiff must show "there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

"We review de novo the grant or denial of an anti-SLAPP motion." (*Park v. Board of Trustees of California State University, supra*, 2 Cal.5th at p. 1067.) """Thus, we apply our independent judgment, both to the issue of whether the cause of action arises from a protected activity and whether the plaintiff has shown a probability of prevailing on the claim.""" (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 671.)

## II.

### THE SCOPE OF THE TRIAL COURT'S ORDER

We first clarify the scope of the trial court's order. Plaintiffs point out defendants believe the trial court struck the fourth cause of action for tortious interference with contractual relationship and fifth cause of action for breach of contract in their entirety. Defendants' understanding of the trial court's order is incorrect.

"Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni, supra*, 11 Cal.5th at p. 1010.) "If a cause of action contains multiple claims and a moving party fails to identify how the speech or conduct underlying some of those claims is protected activity, it will not carry its first-step burden as to those claims." (*Id.* at p. 1011.)

Here, the trial court ordered the following: "The motion is granted as to claims for tortious interference with contractual relations and breach of contract based on the publishing of defamatory articles on the [Web

9

site] BehindMLM. The motion is otherwise denied." The fourth and fifth causes of action each contained multiple claims. There were a few acts providing a basis of relief—the social media statements, the oral statements to distributors, and the BehindMLM articles. But the trial court found only one of the acts was protected, the BehindMLM articles, and proceeded to step two of the anti-SLAPP analysis as to only the BehindMLM articles. As the trial court found the remaining acts unprotected, "the claims based on those acts" survived. (*Bonni*, *supra*, 11 Cal.5th at p. 1012.) Accordingly, the trial court did not strike the fourth and fifth causes of action in their entirety.

Defendants contend plaintiffs had to file a cross-appeal to challenge the scope of the trial court's order. But defendants mischaracterize plaintiffs' argument. Plaintiffs are not challenging the trial court's order or asking for "'affirmative relief.'" (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585.) They are merely correcting defendants' understanding of the trial court's order.

III.

STEP ONE

At step one, "the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) To carry its burden at step one, the moving defendant must "identify what acts each challenged claim rests on and to show how those acts are protected under" one of the four categories in section 425.16, subdivision (e). (*Bonni, supra*, 11 Cal.5th at p. 1009.) The four categories of protected activity "describe conduct "'in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue."'" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620, quoting § 425.16,

10

subd. (e).) Two categories of protected activity are relevant in this case: section 425.16, subdivision (e)(3) and (4). We discuss these two categories below.

"We review the parties' pleadings, declarations, and other supporting documents at this stage of the analysis only 'to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.'" (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 491.) "By requiring that a moving defendant demonstrate that the targeted cause of action is one arising from protected speech or petitioning (§ 425.16, subd. (b)), our anti-SLAPP statute utilizes a reasonable, objective test that lends itself to adjudication on pretrial motion." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 65; accord *Geiser, supra*, 13 Cal.5th at pp. 1254–1255 ["the touchstone is objective reasonableness"].)

We begin by considering what conduct forms the basis for plaintiffs' claims. On appeal, defendants challenge the first (slander), second (trade libel), third (tortious interference with prospective economic advantage), and sixth (civil conspiracy) causes of action. In the first cause of action, plaintiffs allege defendants made several "oral statements to both Awakend and [New U Life] distributors containing false information regarding [p]laintiffs." In the second cause of action, plaintiffs allege defendants "created and published articles containing false information" on the BehindMLM Web site and "conspired with third party 'Youtubers' to publish videos containing the same false information in the articles." In the third cause of action, plaintiffs allege defendants intentionally interfered with Awakend's economic relationships with its distributors "by approaching Awakend distributors to deter them from working with Awakend by defaming [p]laintiffs." In the sixth cause of action, plaintiffs allege

11

defendants "agreed to a common plan or design to commit tortious acts against [p]laintiffs" and "did in fact commit wrongful acts pursuant to the agreement amongst them." Essentially, the conduct can be divided into three categories: statements on social media platforms, the articles on the BehindMLM Web site, and oral statements to distributors.

For purposes of our analysis, we will assume defendants carried their burden of demonstrating the challenged statements published on the BehindMLM Web site were protected under section 425.16, subdivision (e), as we will readily conclude the trial court did not err in finding plaintiffs demonstrated a probability of prevailing on the trade libel, tortious interference with prospective economic advantage, and civil conspiracy claims arising from this protected activity. (See *Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 872 ["we may conclude a contested portion of an anti-SLAPP motion should be denied solely based on a plaintiff's showing of merit, as a sufficiently meritorious claim cannot be struck regardless of whether it arises from activity the anti-SLAPP statute protects"].)

For the remaining challenged statements—the statements on social media platforms and the oral statements to distributors—we will begin at step one.

*A. The Social Media Statements Are Not Protected Under Section 425.16, Subdivision (e)(3)*

Defendants argue the statements on the social media platforms were protected under section 425.16, subdivision (e)(3). Section 425.16, subdivision (e)(3) protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." "'Web sites accessible to the public . . . are "public forums" for purposes of the anti-SLAPP statute.'" (*Wong v. Jing* (2010) 189 Cal.App.4th

12

1354, 1366.) Social media platforms, such as Facebook, can be public forums. (See, e.g., *Balla v. Hall, supra*, 59 Cal.App.5th at pp. 664–665, 673 [a community Facebook page].) But, where defendants fail to cite evidence indicating specific Facebook pages are open to the public, it cannot be concluded the public can access these Facebook pages. (*Turnbull v. Lucerne Valley Unified School Dist.* (2018) 24 Cal.App.5th 522, 534–535.)

Here, as the trial court properly found, defendants do not cite evidence showing the social media profiles or pages, such as on Facebook and YouTube, were accessible to the public. Without such evidence, it cannot be determined all the statements made on the social media platforms were made in a public forum. As defendants fail to show the statements on social media were made in a public forum, we need not consider whether the statements were made "in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

Defendants cite three particular allegations in the complaint to show the Facebook pages and YouTube videos were open to the public. First, plaintiffs alleged Goldstein would "instruct [New U Life]'s top distributors (i.e. Garfield, Juliano, and Cavedon) to share them with Awakend distributors (through social media private messaging and/or creating fake Facebook profiles and *commenting publicly* on Awakend's distributor Facebook pages[)]." (Italics added.) But, in this context, the phrase "commenting publicly" appears to refer to the act of posting a comment on a Facebook page. The allegation does not specify whether the Facebook pages themselves were accessible to a significant number of users or to the public.

Second, plaintiffs alleged defendants "would conspire with third party 'Youtubers' to make and *publish* videos about Awakend." (Italics added.) But the word "publish" here does not necessarily imply the video was

13

accessible to the public. The video may have been published to a private, select number of viewers.

Third, plaintiffs alleged defendants "paid employees to write disparaging articles with the intent to distribute these false statements to as large a public as possible." This allegation does not show the statements on social media were open to the public. It merely indicates intent.

*B. The Oral Statements to Distributors Are Not Protected Under Section 425.16, Subdivision (e)(4)*

Defendants argue the alleged oral statements they made to distributors are protected under section 425.16, subdivision (e)(4), the so-called catchall provision. Section 425.16, subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

The catchall provision "calls for a two-part analysis." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).) First, we examine the "content of the speech" to decide what "'issue of public interest' the speech in question implicates." (*Ibid.*) In determining what is an "issue of public interest" (§ 425.16, subd. (e)(4)), courts have considered various factors, including "whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity.'" (*FilmOn, supra*, 7 Cal.5th at pp. 145–146.) The first part of the analysis "is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public

14

issue, even if it also implicates a private dispute." (*Geiser, supra*, 13 Cal.5th at p. 1253.)

Second, we look at the context of the speech. "[W]e ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*FilmOn, supra*, 7 Cal.5th at pp. 149–150.) Contextual considerations include the "audience, speaker, and purpose" of the statement. (*Id.* at p. 152.) "[T]he catchall provision demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*Id.* at p. 150.) "'[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself *contribute to the public debate.*'" (*Ibid.*, italics added.) "We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.)

Defendants argue the content of their speech implicates issues of public interest. Their alleged statements to distributors included: (1) referring "to Meoli as 'the cunt' and 'the bitch'" and stating "she was a 'liar' who could 'not be trusted'"; (2) saying "James was a 'pedophile' and a 'rapist' or refer[ing] to him as 'the criminal' who 'served time in prison'"; and (3) asserting "Awakend was a 'pyramid scheme' and the product was being illegally sold."

But, as the trial court correctly found, even if these oral statements were to implicate issues of public interest, defendants "made no showing that the statements . . . contributed to [the] *public* debate." They

15

were merely private statements made to Awakend and New U Life distributors.

Defendants argue, for the first time on appeal, the oral statements contributed to the public debate because plaintiffs alleged defendants "sought to spread" false statements to undermine Awakend's business. In support, defendants cite Engel's declaration, in which he quotes Spainhour saying defendants wanted "the field [of distributors] to share these reports." Defendants also invoke Rexford's declaration, in which she avers two of her New U Life distributors informed her they heard Meoli partnered with James, a sex offender, to start Awakend and one of her distributors received a copy of James' criminal report from Juliano. Defendants assert Rexford's declaration suggests "the information shared became part of a wider conversation among the MLM community."

"'It is axiomatic that arguments not raised in the trial court are forfeited on appeal.'" (*People v. Graham* (2024) 102 Cal.App.5th 787, 798.) "Although appellate courts have discretion to consider an issue in the first instance if it raises a question of law on undisputed facts, our Supreme Court has cautioned that such discretion should be exercised rarely and only in cases presenting an important legal issue." (*Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44–45.) We therefore deem these arguments forfeited.

IV.

STEP TWO

"If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral, supra*, 1 Cal.5th at p. 396.) "The 'burden of

16

establishing a probability of prevailing is not high.'" (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702.) Claims need only have "'minimal merit'" to proceed. (*Baral*, at p. 385.) "[A] plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*).)

Step two is a "'summary-judgment-like procedure.'" (*Baral, supra*, 1 Cal.5th at p. 384.) We do "not weigh evidence or resolve conflicting factual claims." (*Ibid.*) The court "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Id.* at p. 385.) Any "'gaps in a party's evidentiary showing may certainly be filled by the opposing party's evidence.'" (*Teamsters Local 2010 v. Regents of University of California* (2019) 40 Cal.App.5th 659, 667.) "[W]e must credit all *admissible* evidence favorable to [the plaintiff] and indulge in every legitimate favorable inference that may be drawn from it." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1238.) "The court . . . must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." (*Baral,* at p. 396.)

Defendants' challenge to the trial court's findings at step two is narrow in scope. They contend only plaintiffs failed to provide competent, admissible evidence in support of some elements of the trade libel, tortious interference with prospective economic advantage, and civil conspiracy claims. We first address defendants' apparent challenge to certain evidentiary rulings under the abuse of discretion standard. We then consider whether the trial court erred in refusing to strike the claims for trade libel,

17

tortious interference with prospective economic advantage, and civil conspiracy, based on the BehindMLM articles, because of insufficient evidence. As the first cause of action for slander is not based on protected activity, we need not address defendants' arguments regarding the first cause of action for slander at step two.

*A. The Trial Court Did Not Abuse Its Discretion By Overruling the Challenged Evidentiary Objections*

"'[T]he proper view of "admissible evidence" for purposes of the SLAPP statute is evidence which, by its nature, is capable of being admitted at trial, i.e., evidence which is competent, relevant and not barred by a substantive rule. Courts have thus excluded evidence which would be barred at trial by the hearsay rule, or because it is speculative, not based on personal knowledge or consists of impermissible opinion testimony. This type of evidence cannot be used by the plaintiff to establish a probability of success on the merits because it could *never* be introduced at trial.'" (*Sweetwater, supra*, 6 Cal.5th at p. 947.)

"[T]he court may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater, supra*, 6 Cal.5th at p. 949.) At step two of the anti-SLAPP analysis, "the affidavit or declaration is offered to demonstrate that admissible evidence exists to prove plaintiff's claims. The statements must reflect that they were made by competent witnesses with personal knowledge of the facts they swear to be true." (*Id.* at pp. 944–945.) "[T]he *written statements themselves* need not be admissible at trial, but it must be reasonably possible that the *facts asserted* in those statements can be established by admissible evidence at trial." (*Id.* at p. 948, fn. 12.)

18

We review the trial court's rulings on evidentiary objections for abuse of discretion. (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021.) "An erroneous evidentiary ruling requires reversal only if there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error." (*Ibid.*)

1. Engel's Declaration

Defendants argue the trial court erred by overruling certain objections to Engel's declaration. Defendants assert plaintiffs argued below that Engel's declaration showed defendants drafted defamatory articles and sent them to BehindMLM, but Engel was unable to show he had personal knowledge of defendants drafting and sending the articles to BehindMLM.

Defendants conflate their challenge to the trial court's evidentiary rulings with their challenge to the proper use of evidence at step two. We address the challenge to the evidentiary ruling here and the trial court's use of the declaration below. In his declaration, Engel said he "personally observed" certain actions by defendants, which he thereafter described in his declaration. Therefore, defendants fail to show the trial court abused its discretion by overruling the personal knowledge objections.

2. Meoli's Declaration

Defendants contend the trial court erred by overruling its objections to Meoli's declaration. In her declaration, Meoli averred: "[E]ver since the BehindMLM articles were published and [d]efendants began contacting distributors to defame me, . . . James, and Awakend, Awakend has lost several distributors and potential distributors. For example, Awakend has lost [several individuals] as distributors or potential distributors because of the defamation. These individuals refused to be associated with me, . . . James, and Awakend because of what [d]efendants stated. This has

19

resulted in lost revenue to the company because these individuals would have been promoted and sold Awakend's products but for the defamation published by [d]efendants."

Defendants assert Meoli lacked personal knowledge of the distributors or potential distributors' reasons for refusing to associate with Awakend. They also posit the statement—"This has resulted in lost revenue to the company because these individuals would have been promoted and sold Awakend's products but for the defamation published by [d]efendants"—is inadmissible speculation. But defendants do not show why it is not "reasonably possible that the *facts asserted* in those statements can be established by admissible evidence at trial." (*Sweetwater, supra*, 6 Cal.5th at p. 948, fn. 12.) Thus, defendants fail to demonstrate the trial court abused its discretion by overruling these objections.[1]

*B. The Trial Court Did Not Err in Refusing to Strike the Claims for Trade Libel, Tortious Interference with Prospective Economic Advantage, and Civil Conspiracy Based on the BehindMLM Articles*

As we explained above, the trial court did not abuse its discretion in admitting the contested evidence. Nonetheless, defendants appear to argue the trial court improperly relied on this evidence in finding plaintiffs showed they established certain elements of the claims for trade libel, tortious interference with prospective economic advantage, and civil conspiracy. We

---

[1] In a footnote in their opening brief, defendants challenge the trial court's evidentiary rulings on Warwick's and James's declarations. We deem these arguments forfeited, as footnotes are improper vehicles for presenting arguments on appeal. (*Pasternak v. McCullough* (2021) 65 Cal.App.5th 1050, 1058, fn. 6.)

20

disagree and conclude plaintiffs presented sufficient evidence to support their claims.

Before proceeding to this analysis below, we observe defendants do not challenge the trial court's findings as to the remaining elements of these claims. "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) We therefore presume the trial court properly found plaintiffs established these elements, and do not address them on appeal. If defendants intended to challenge the trial court's findings as to the remaining elements, we conclude their argument is forfeited.

1. Trade Libel

Defendants argue plaintiffs failed to offer any competent, admissible evidence showing: (1) any of the individual defendants wrote and published the BehindMLM articles, and (2) plaintiffs suffered a pecuniary loss as a result of the BehindMLM articles.[2] We address these arguments in turn.

---

[2] "Trade libel is generally defined as "'an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff.'"" (*Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 925.) "To constitute trade libel, a statement must be false" (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010) and made with actual malice (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 97). ""'[T]he plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages.'"" (*Muddy Waters*, at p. 925.)

First, plaintiffs submitted Engel's declaration, which shows New U Life and Goldstein wrote and sent the articles to BehindMLM for publication. Engel averred he worked closely with defendants and Spainhour. He stated Goldstein had a "plan to harm Awakend," and observed defendants' efforts "to disparage the reputations of Awakend, [Meoli], and James" and "to hinder the success and growth of Awakend." Engel declared Spainhour wrote an article and, "at the direction of Goldstein," sent the article to BehindMLM. Drawing all inferences from the evidence in favor of plaintiffs, we find Engel's declaration shows Goldstein directed Spainhour to write and send the articles for publication on BehindMLM's Web site under the name "Oz," and Spainhour, a New U Life employee, acted on behalf of New U Life or Goldstein as their agent.

Second, plaintiffs provided Meoli's declaration, which demonstrates they lost specific business relationships because of the BehindMLM articles. A plaintiff must show he "suffered direct financial harm because someone else acted in reliance on the defendant's statement. [Citation.] To establish this element, [it] "'is not enough to show a general decline in [plaintiff's] business resulting from the falsehood, even where no other cause for it is apparent, . . . it is only the loss of specific sales that can be recovered. This means, in the usual case, that the plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived.'"" (*Muddy Waters v. Superior Court, supra*, 62 Cal.App.5th at p. 925.)

In her declaration, Meoli stated Awakend "lost several distributors and potential distributors" because of the BehindMLM articles. She identified five individuals who refused to "associate[] with [her], . . . James, and Awakend because of what [d]efendants stated." Meoli

22

averred, as a result of losing these distributors and potential distributors, Awakend has lost revenue. This declaration is sufficient evidence to show pecuniary loss.

2. Tortious Interference with Prospective Economic Advantage

Defendants contend plaintiffs did not offer any competent, admissible evidence of disrupted economic relationships or economic harm caused by defendants.[3] But, for the same reasons in our discussion of pecuniary loss, Meoli's declaration shows the BehindMLM articles disrupted Awakend's economic relationships and caused economic harm.

3. Civil Conspiracy

Defendants assert the civil conspiracy claim fails under the agent's immunity rule—i.e., "duly acting agents and employees cannot be

---

[3] "Interference with prospective economic advantage consists of '(1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party.' [Citation.] The intentional act at issue must be 'independently wrongful.'" (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 376.)

held liable for conspiring with their own principals."[4] (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 512.) But, as the trial court correctly observed, defendants failed to present evidence they were all New U Life employees or agents. In his declaration, Goldstein stated he is the chief executive officer and owner of New U Life. But defendants do not offer evidence as to Garfield, Juliano, and Cavedon's relationship to New U Life. According to Meoli's declaration, Garfield, Juliano, and Cavedon are not New U Life employees, and Juliano and Cavedon are independent distributors. Nothing in the record shows Juliano and Cavedon, despite being independent distributors, had an agency relationship with New U Life. (See *Olson v. La Jolla Neurological Associates* (2022) 85 Cal.App.5th 723, 738 [""'Agency and independent contractorship are not *necessarily* mutually exclusive legal categories . . . . In other words, an agent may also be an independent contractor.'" [Citation.] However, the party asserting that an independent contractor is also an agent bears the burden of proving the existence of an agency relationship"].)

Defendants argue Garfield, Juliano, and Cavedon were agents of New U Life, citing an argument in plaintiffs' opposition to the anti-SLAPP

---

[4] "To establish conspiracy, a plaintiff must allege that the defendant had knowledge of and agreed to both the objective and the course of action that resulted in the injury, that there was a wrongful act committed pursuant to that agreement, and that there was resulting damage. [Citation.] A conspiracy requires evidence 'that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it.' [Citation.] Thus, conspiracy provides a remedial measure for affixing liability to all who have 'agreed to a common design to commit a wrong' when damage to the plaintiff results. [Citation.] The defendant in a conspiracy claim must be capable of committing the target tort." (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 652.)

motion. But this is an argument, not evidence of an agency relationship. Thus, defendants' argument is unavailing.

Defendants also contend, for the first time on appeal, plaintiffs' allegations showed Garfield, Juliano, and Cavedon were agents of New U Life. As the defendants did not present this argument in the trial court, we find the argument forfeited. (*People v. Graham, supra*, 102 Cal.App.5th at p. 798.)

## DISPOSITION

The order denying in part the anti-SLAPP motion is affirmed. Plaintiffs are entitled to costs on appeal.


MOTOIKE, J.

WE CONCUR:


MOORE, ACTING P. J.


SANCHEZ, J.